Education Foundation v. American Board of Internal Medicine. Andrew Schlafly. I'm Andrew Schlafly, and I represent Appellant AAPS. This case concerns censorship in a partisan manner by several monopolies. The board defendants, and I'll get to the government later, but addressing the board defendants first. ABIM, ABFM, and ABOG have monopolies over board certification in their specialties. Board certification is now required by most hospitals and insurance networks. Revoking board certification is tantamount to ending the medical career of most physicians. And I want to emphasize that because we don't have anything like it in the legal profession. We have certification in the legal profession, but it doesn't end anybody's career if they get it, they don't get it, they let it lapse. I never got appellate certification. I don't think it sent me back. In the medical profession today, board certification is required by most hospitals. What happens if a physician loses it? He's done. He gets kicked off the medical staff of the hospital, and he can't practice medicine in a practical manner anymore. He would have to change his specialty. He's pretty much, his career is over. So it's the opposite, your submission is it's the opposite of what we understand the legal profession to be. Yes, Your Honor. It might as well be a government license. Yes, Your Honor. As a practical matter. Is it required for state licensing purposes? It's not required for state licensing purposes, but again, it's required to be on medical staffs at hospitals. So if you're delivering babies, for example, those are done in hospitals. And if you lose your board certification by the ABOG, which is one of the defendants here, you can no longer deliver babies because you cannot get on the medical staffs of any hospitals, and you cannot get in insurance networks either. So this is a critical point, and I just want to pause and spend time on that. It's unlike any other profession. And this has occurred incrementally. It's more and more hospitals have required this over the years. So if you go back to what your father or grandfather may have done, it wasn't as big a requirement 20, 30, 40 years ago. But today it is. If a physician loses his board certification, in most cases, the physician's medical career is over. I guess the analogy to the law would be if there was only one law school, and you have to go to law school to be a lawyer. Right. Okay, so that's your basis of sort of a theory of market power? Yes, Your Honor. Can we talk about this a little bit? Do I understand correctly this is a Sherman Act Section 2?  Why didn't you plead Section 1, just out of curiosity? Because I'm not alleging a conspiracy between different entities. I'm alleging that each of these entities is itself misusing its market power, is doing something improper with its own monopoly. So each of these board defendants are in their own specialty, internal medicine, family medicine, and obstetrics and gynecology. And I'm alleging that they're violating Section 2 by misusing their market power, the way they're maintaining their monopoly. And so I think a Section 2 allegation is the better approach to this. What I'm really getting at is the censorship. And what's happening is these three board defendants have embarked upon a campaign of targeting physicians who are speaking out publicly in a way that the board defendants don't like. So they're physicians who speak out on some controversial issues today, like abortion, and we have them at our AAPS conferences. And so we have pro-life presentations by physicians who speak about the harm from abortion. Well, now these physicians have to worry about ABOG revoking their board certification. If ABOG doesn't like what they're saying about the harm flowing from abortion. And ABOG has put scary statements on their website, on the anniversary of Dobbs. They did it when Dobbs came out, just after it came out, about two weeks later, and they did it on the anniversary of Dobbs, and said, we strongly disagree with Dobbs, we think it's very harmful, and so on, and we're going to take action against board certifications of anybody who engages in misleading information about abortion. Well, unfortunately, ABOG thinks that almost anything that criticizes abortion is misleading information about abortion. So now they've created this chilling effect for pro-life physicians, and so that's part of the case. Your theory of antitrust liability is an organization with market power is abusing that market power to exclude competition. Essentially, yes. I'm assuming one response will be, the whole point of a board is to maintain a certain level of quality of service, we don't want bad doctors out in the world, just like the bar doesn't want bad lawyers out in the world. What's your response to that justification of the market exclusion? And that's fine, and that's worked for generations. And that works with the many other specialty boards out there. There are 24 specialty boards that are part of this same network. It's only three who are doing this out of the 24. So that's fine if they want to focus on bad patient outcomes, someone who's a bad doctor, if they want to revoke certification for someone who's harming a lot of people, that's fine. But what they're doing has nothing to do with patient outcomes. They're stating brazenly that they have a right and they will revoke board certification based on public statements by physicians on matters of public policy. Your point is quality standards outside the context of this case, just traditional quality standards, that's pro-consumer, so that type of exclusion of competition is ultimately pro-consumer, whereas this, what you're talking about here, what you allege here is just anti-consumer. It doesn't help the consumer at all. Right. And it's a wrongful maintenance of their monopoly. Now, it's not just antitrust claim that I have against them. I also have a First Amendment claim against them. So what they're doing, because they've created this chilling effect, and— Just to focus on Sherman, what's your best case for the proposition that this type of use, you say abuse of a professional association of boards' powers constitutes Sherman Act liability? There is not a case right on point. This is essentially an issue of first impression. So I don't— Here's that Indiana dentistry case by the Supreme Court. I don't know if you're— I don't think that was a censorship case. No, but it's the use—it's not a cancel culture type fact pattern, but it is assessing antitrust liability for medical associations. Yes. Yes. The Lorraine Journal case, which is in our briefing, and I've gone back and re-read that again and again. It's a Supreme Court case about a newspaper in Ohio that said, we're not going to accept advertisements from any merchants that also advertise on the radio station. So there's a new radio station that came into town, a small town. There's a powerful local newspaper in Ohio called the Lorraine Journal. And they were bullies, I guess, whatever, abusing their monopoly. And they said, we're not going to take ads from merchants if you also advertise on the radio station. And I went up to the Supreme Court. The Supreme Court said, this is an antitrust violation. That is conceptually similar to what I'm talking about here with our conferences, where these board defendants are saying, if you go and you speak out pro-life or also some of the presentations about vaccines, and we don't like what you're saying, it's at a conference. It's speech. It's pure speech. We're not treating patients or anything. And we don't like what you're saying. We're going to revoke your board certification. So it's a similar type of punishment by these monopolies that interferes with our ability to have candid presentations at our conferences. Just out of curiosity, a revocation of a certification, is there any type of notice and hearing provided? Or can it be just done unilaterally and literally overnight? They usually provide an internal hearing that the physicians perceive to be very unfair and stacked against them. There have been some revocations already since I filed the lawsuit. I don't know that they would do it summarily. I haven't heard of that, to give them credit. I don't think they just summarily do it. They do provide for some sort of internal rights, but you're going before their own people. It's not an independent review. And so we get to the First Amendment claim, and unfortunately, the trial judge below, he made some mistakes on this. And he said, first of all, he's not sure that the Fifth Circuit has recognized a constitutional right to hear. Well, we have. That's basic, fundamental. It's pretty well established. Right. And so then he said, well, even if there's a right to hear, there's no willing speaker alleged in the complaint. Well, I didn't allege a willing speaker who's chilled by this, because I don't want to subject them to the retaliation. And there's no particularity requirement in pleading on this sort of issue. This isn't fraud. Your theory is self-censorship is the point. Your theory is that self-censorship is the point. That's why there are no willing speakers, is because people are being pressured. Under your theory, people are being pressured to self-censor. Yes, Your Honor. And so it's that harmful chilling effect. And so we have Article III standing on that basis, because our conferences are weaker because of it now. And I could provide an affidavit in the district court below, a simple two-page affidavit by a doctor who says, yes, I would like to come and talk about the harm caused by abortion, but I'm afraid to, because of what ABOG is doing now. And so I'm not going to give that candid talk, or a coming talk, it's not going to be as candid as I would like it to be. I could get a two-page affidavit from a whole bunch of speakers like that, easily. I'm sorry, you say you could. I could, I could, yeah. Then why haven't you? Well, because the judge... The problem is that they're afraid of being ostracized. Well, right, so I haven't done that because I don't think I have to. If you look at the cases on standing, you do that at summary judgment. You don't do that in the pleading. So I don't feel I have to at this stage, but also the trial judge did not give me an opportunity to either. When you're done, and there's a local rule they have in Galveston, when they toss you out, you're done. There's no opportunity to amend your complaint. They have instituted their own local rule that is contrary to the federal rules. I'm not exaggerating. Do you know when this rule was enacted? I need to look further into that. That I don't know. Sorry, I should know, but I don't know that. There were some other errors below. The misreading of... Since we're on the First Amendment issue, do you want to talk about the state action? On... The state action issue. Which issue, I'm sorry? On the First Amendment claim. Do you want to talk about the state action issue? I would, yeah. These are private boards. Thank you, Your Honor. I would like to talk about the state action. The district court did not reach the state action, but that may actually be the strongest legal theory that we have today. The antitrust... I will candidly say the antitrust press on this is not crystal clear. I think there should... I think a monopolist should not be allowed to censor. And actually, this court said two years ago, said we're not going to allow corporations to censor free speech. And so I think on that basis, a monopolist should not be licensed. But the First Amendment claim, I think, is even stronger. Because board certification has become the equivalent of medical licensure. So it's a public function now. It's a public function in state action here. District court never reached it. And that's a fact-intensive inquiry. So I think that would probably be best remanded to address that. But I think they are acting like the state here. And therefore, they cannot infringe on First Amendment rights. That brings in... Once you get state actors, that brings in all the First Amendment protections.  has delegated this function to these private boards? Or that the private boards have simply occupied the field and the government's therefore not stepping in? The government's allowing it to happen. That's an excellent question, Judge Ho. The government's allowing it to happen. I think delegation might be too strong. But in the state of Texas, for example, there's actually a statute that says a doctor cannot refer to himself as board-certified unless he's board-certified with these groups. So there is some sort of cooperation. Okay, but that's just an anti-fraud type rule. Right. I'm not sure that's... Yeah, that's right. I mean, strictly to the government now, the government argued that the case against them is moot. I challenged the Disinformation Governance Board. They said in a press release that they've disbanded that, but if you dig into what they really did, they said, well, we're just going to continue doing it in other ways. And they never complied with FACA, the Federal Advisory Committee Act, in terms of releasing documents, in terms of getting balance on their committees, and so on. And lo and behold, it caught the court's attention in a 20HA letter, the Ficker case, where the government unanimously reversed a, well, I guess upheld, a decision that it's not moot, a lawsuit against the government, even though they say they've stopped the objectionable action, it's not moot unless they prove they're never going to do it again. And they have not proven that here. That's an absolutely clear, it won't recur language, right? Exactly. And the court unanimously held that just two weeks ago. And I would submit that the government has not proven they're not going to do this again. In fact, they're saying candidly they're going to continue to combat what they call disinformation. The problem is disinformation is, a lot of it's political. Thank you, Your Honor. Thank you. You've reserved five minutes. Mr. Brewer. Good morning. May it please the court, Simon Brewer for the Secretary of Homeland Security. The district court correctly held that the claims against the secretary are moot following the dissolution of the Disinformation Governance Board. The secretary acted in accordance with the recommendation of the Homeland Security Advisory Council to disband the board and terminate its charter. Those formally announced changes in the government's policy made all of the claims against the government moot. There is nothing left to enjoin, which is the request that the plaintiff made for relief in its complaint. Remind me, and pardon my ignorance. It's been a busy week. What was the timing of that announcement relative to the timing of the lawsuit? The board had been paused in May prior to the commencement of the lawsuit. And then the council adopted the subcommittee's recommendation for a final interim recommendation that there was no need for a Disinformation Governance Board. I'm sorry, you said council? The Homeland Security Advisory Council. Oh, got it, okay. So it adopted... The decision in response to the congressional election. It adopted that recommendation in July 2022, shortly after this case was filed. And then the secretary formally terminated the board in August 2022, the month after the case was filed. And then the final step, you're saying, was after the lawsuit? That's right. The review had already been undertaken by the time the lawsuit was filed. And the board was already indefinitely paused at that point. So the government had already taken the initial steps towards alleviating the injuries alleged in the complaint. And I think that underscores that there's no indication of any kind of strategic posturing or litigation considerations that there was no need for a Disinformation Governance Board. And again, that remedied the only harms alleged in the complaint, which focused exclusively on the purported chilling effect that the very existence of the Disinformation Governance Board caused plaintiff. And so having achieved all the relief sought in the lawsuit, there is nothing left to enjoy in here. Is there an assurance, either in the record below or that you're willing to provide now that the Department of Homeland Security has not reconstituted the board or replicated its functions and it has no intention to do so in the future? Okay. Is there an assurance that it's not going to happen? It's fine if it's not, but I'm just asking. I have you here. I might as well ask. That's as far as I'm authorized to go. And I take it then this probably follows. There's been no assurance provided in the record below either. Why there is no need for a Disinformation Governance Board. And again, the Secretary acted in accordance with that recommendation. So I think that explanation for the change in policy should provide at least some assurance as to the genuineness of the motivation here and the reasons behind the Secretary's actions. I'm happy to answer any other questions the panel has. Why were they dismissals with prejudice? Do you agree with me that on the grounds, the stated grounds for dismissal should have been without prejudice? Yes, Your Honor. Footnote 5 in our brief agrees that the dismissal should be modified to without prejudice. We urge you to affirm the judgment as modified to dismissal without prejudice. Thank you. As to the Homeland Security? As to the Secretary. Thank you. Ms. John. Good morning. May it please the Court. Leslie John on behalf of the Board of Defendants, the American Board of Internal Medicine, the American Board of Obstetrics and Gynecology, and the American Board of Family Medicine. Excuse me. We have dismissed plaintiff's First Amendment and antitrust claims against the Board of Defendants for three reasons. First, plaintiff whose speech is not at issue has no standing under the First Amendment under a right-to-hear theory without identified speakers who would speak at want of plaintiff's events but for the challenged conduct. But doesn't that beg the question? Isn't the point of the lawsuit that there are significant repercussions if a person is named? Those persons can be named through discovery, can't they? I mean, I agree with you that it's essential that they have one, but we're at the pleading stage. There is no allegation that they actually have one, and that's the key point. There are no factual allegations in the complaint. Well, it sounds like you're willing to amend to make that clear. Well, the plaintiff in front of a circuit court, I heard the plaintiff say, we can come forward with affidavits. And I would say that's... I think he indicates in the brief that there are specific, at least one specific person. Well, so in the district court, what the plaintiff said was not that there was a willing speaker, but that there was a speaker who had spoke at one of plaintiff's educational conferences and now is subject to board discipline. There was no allegation even in the brief that that individual who was named would come to one of plaintiff's educational conferences. Do you agree, counsel, that the local rule cited by the district court is in deviation of the federal rules? What I would say is that... Do you agree? Do I agree? I think it's a different interpretation of the federal rules. What is provided is you send a letter. It's junk, isn't it? I mean, that's a local rule that's junk. It's procedural junk. But what the plaintiff was obligated to do, I think you can put that issue aside, quite frankly. Well, I don't know. If he can amend to state a claim, then I don't think we can put it aside. And we're at that point now because you're saying, you led off with your argument that he must allege that there is an individual or individuals, and we now... He's told us that he could have amended that in. So amendment's pretty important at this point. In the brief, what plaintiff could have done is told the court, I can amend, and I can amend to show that there is a willing speaker because of the following facts and set forth those facts. In the brief, the plaintiff did not do that. What the plaintiff instead did in the brief was said, I would like leave to amend if in any respect my allegations are found to be deficient. And what this court has said in decisions, upholding that it's not an abuse of discretion to deny leave to amend, is that the plaintiff has the obligation to tell the court why amendment would not be futile. Here in the brief, if you look in the district court brief, the plaintiff never told the court why amendment would not be futile. The plaintiff never came forward and said, I have a willing speaker. I put on these educational conferences. I'm in a position to know whether or not speakers will come to my events and speak. And I could tell the district court in my brief, yes, I've gone out there. I've talked to the speakers. They won't come to my conferences. I can set those facts forth if you give me leave to amend. It's not sufficient to say, if in some respect you find my complaint to be inadequate, I would like to leave to amend. No, you need to come forward with those facts to tell the court why this is not a futile exercise, why that would make a difference. In the Fifth Circuit cases that we cite in the district court brief make that clear, and that has been said time and time again by the court, that there needs to be a showing of what those facts are that would make a difference, and you need to tell that to the district court. It's a little late to come before the Fifth Circuit, and we do cite a case to that effect and say to the Fifth Circuit, well, we might have facts that we could allege now. Is it possible that one explanation for this type of litigation strategy is this local rule? In other words, they can't assume that the local rule will be blown up on appeal. They have to at least try to appease it. I think if you're going to request leave to amend before the district court, the reason why is you're going to say you have facts that will make a difference to the court's judgment, and so it's important to come forward with those facts, and we pointed out very clearly in our opening brief the deficiencies which are rife in this complaint. There are many, many deficiencies, many situations. State action is another one, and when we get to the antitrust claim, that's yet another one. There are many respects in which this complaint is completely devoid of the kind of factual enhancement that the court speaks to in Twombly as being necessary. So when that is brought in front of the court, which we brought in our opening brief, the response to that is I may agree or disagree whether either of those facts are needed, but here are the facts that I have. I could amend my complaint. I could demonstrate these facts, and that would make a difference, and that's what wasn't done in the lower court. Let me ask you, both in the complaint as well as your opponent's arguments today, board certification, would you agree with your opponent that board certification isn't just a good housekeeping seal of approval? It's rather a base requirement to work at most hospitals and being a part of insurance networks. Do you agree with his characterization? No, and what I would say is the license to practice medical care and medical medicine is exclusively governed by state boards of medicine. So you can practice... There are people at hospitals that are doing one of these specialties that do not have board certifications. It varies by area of the country. It varies by whether the area, for instance, is a rural area or an urban area. Board certification is a hallmark of physician quality. Hospitals make independent decisions in part based on local circumstances whether or not they believe that that's an important marker to them. Some hospitals decide it is an important marker of physician qualities. Other hospitals do not. How many hospitals don't care? You know, I think... It's okay if you don't. I don't know exactly what the number is. You're saying it's non-zero. It's not attributable. How many hospitals... I will agree that many hospitals do require it. But on the other hand, there are hospitals who do not require it. And again, it's something that varies by the circumstance that's facing that particular hospital and what they decide is important. There are many different markers in all professions that can be considered markers of quality. How does the board decide what is misinformation or disinformation? Is there some group? I mean, if someone walks in and says, you know, I really think that the earth in fact revolves around the sun, is there a board that says, oh, no, no, no, for that you lose your certification? So there are due process requirements built in. When a physician goes... Let me back up just a little bit. When a physician comes before the board and says I want to be board certified, they have an agreement with the board that governs the terms of the board certification, which include professionalism requirements. The board... To hold yourself out as board certified, you not only have to pass an exam, but you have to demonstrate over time that your knowledge remains current in the field. So if someone sees a board certified doctor, they can be assured that that doctor has kept current and is behaving in a way that we believe is professional. So that is decided by a committee. There are due process rights to appeal that decision. And the doctor fundamentally, at the end of the day, if the doctor disagrees, I am sure we will see lawsuits about does that comply with the agreement between the board and that particular physician. It's important to remember who this plaintiff is. This plaintiff is an educational foundation that sponsors medical conferences. This plaintiff is not an association, is not a group of doctors. So this is the educational foundation that co-sponsors medical conferences. If a doctor disagrees fundamentally with a decision made about whether to maintain that board certification, that doctor not only has appeal rights before that board, but they have the decision about whether or not they're going to bring before a court their claim that their due process rights have been violated. That's something that physicians can bring before the court. And I think that's important in terms of kind of looking at the context of these claims. And so, for instance, looking at is there standing to bring an antitrust claim, for instance, where the Fifth Circuit has said time and again that the plaintiff and the defendant have to be participants in the same market to have antitrust standing. So what would that mean here? It would mean the boards and those physicians certified by them as purchasers of board certification and competitors to the boards, that offer medical certification. Those would be the proper parties before the court to bring an antitrust claim. And when it comes to... Well, I assume what they would say, what opposing counsel would say, is they're a type of consumer. They're a type of consumer. They would like to have access to doctors who will be comfortable sharing certain beliefs. I agree that they're not competing with you guys. That would be a downstream view, which, again, the Fifth Circuit has said... This is the indirect purchaser problem? Right. It's not adequate to assert a claim. That is a claim, an antitrust claim, such as a monopolization claim, which is what we have here, is to be brought by either the doctors on the one hand or competitor boards on the other hand. And... So if they had amended, it sounds like the opposing counsel claims that they have doctors who theoretically would swear an affidavit. They would have one of those as plaintiffs that would cure the standing problem, but the problem is they don't have one of those now. They've never... This has never been a lawsuit brought by physicians. Right. That's your argument, is that the doctors would have standing, but they have no doctors, and they've never presented any doctors. Correct. Can I ask a few more questions about the antitrust theory? I understand your background is antitrust law, so this is fair game. I'm assuming you're aware that there have been state legislatures, at least in Texas, but I think around the country, about what different doctors can do in different fields, and it's all a big... It's a very hot field for... I think there was one about optometry, and there's psychiatry, and all these sort of definitions about what doctors can do. So here's my antitrust question. You take a medical association, a particular part of the practice, and if they all agree, we're just not... All of our doctors agree for whatever reason, let's just say for profit reasons, none of us are going to provide a certain type of service to our patients. We'll say publicly, it's for consumer value, for consumer safety, but in reality it's because we don't want to undercut our profits. Would that sort of collusion create antitrust questions? Collusion always creates antitrust problems. Clearly. Here, one thing you have to keep... So in other words... Go ahead, please. Sorry. One thing you have to keep in mind is that the boards are independent certifying organizations. They are not groups of physicians in the practice that get together and are independent economic actors that could collude with one another. In fact, that's a requirement of being a board, an ABMS board. You have to have an independent organization that is not a market participant, so is not a physician, deciding on certification. So you're not excluding people from your approach. I'm sorry, I want to make sure I understand. You're saying the requirement of these boards is what exactly? They're independent. They are not like, for instance... They're not comprised of doctors themselves? They may have doctors that are employees of the boards and staff members, but what they are not are not associations of physicians. It's set up as an independent organization that says, here are the quality standards. Here is what, if you're board certified, we think it's important that you know. Here's the requisite knowledge that you need. Here's the requisite training that you need. But surely these boards talk to, consult, employ, may even have board members who are practicing in that field. Yes, that is correct. That's how, again, I have some experience with state medical boards. That's how they work, too. That is correct. But they are not medical associations. So it's not an association. It's not a membership group, is what you're saying. Correct. Okay, but it is dominated by the players. Maybe not all the players. Yes, and they have public, they have members of the public that weigh in as part of the process. Quick follow on to my earlier question. I think you said, I think quite rightly, of course, that's a classic collusion, fact pattern. If a medical association says, we're all agreed, none of us are going to provide service X to our customers. Different hypothetical. We're all agreed that none of us are going to express a certain viewpoint. Would that be, and anybody who doesn't, we're going to shun and decertify. Is that, that may or may not be profit oriented, but it would have the same anti-competitive effect. Would you agree? So, I think that poses a really interesting issue. More cutting edge. I don't think, in fact, that you have seen any case law cited by the plaintiff here that mixes First Amendment with the antitrust laws. And so, what you get back to is looking at what the courts have said the purpose of the antitrust laws are, which are, in fact, to preserve competition in markets, to preserve prices, you know, being as low as possible. Right, but that's not it. You know, certainly one principle of antitrust law is we want to promote competition, combat monopolization, combat conspiracies, in order to increase the availability of the market, thereby decreasing prices for consumers. So, if an association gets together and says, we're going to shun anybody who likes the Brooklyn Dodgers or the LA Dodgers. I don't know where the Dodgers are these days. I'm not a baseball guy, sorry. But you get my point. They just agree, for whatever reason, to exclude people with a certain viewpoint that is completely idiosyncratic and irrelevant to equality to the consumer. Wouldn't that be, even if not profit-oriented, or maybe there is some weird secret profit motivation, but even apart from, I've always understood antitrust law to be about anti-competitive effect, separate apart from whether there's an economic motive. Well, what's the... Right, so it's excluding competition. What's the anti-competitive effect? The exclusion of competitors, right? But have competitors, I guess what I would want to know is, have competitors, in fact, been excluded? No, that's a good question. In this... If everybody agrees on the Dodgers, then there's no effect. How are you to practice medicine without being board-certified? Well, presuppose the market power question. Presuppose, which is something I know you disputed certainly earlier, but presuppose a world in which the association has the market power that they certainly allege, that you're basically ostracized. You're not going to be able to, you're going to leave the industry and do something else. In that world where you presuppose market power and there is an effort to exclude, an agreement to exclude has nothing to do with the work. Wouldn't that be naturally... You're literally excluding people from the market, thereby increasing prices to the consumer if nothing else. What you're positing... If people are excluded. What you're positing would be a concerted refusal to deal under Section 1. That's why I asked the Section 1 question. That would get back to a conspiracy claim. And what we have here, of course, is a Section 2 claim, which is a monopolization claim. And you may have heard, which is obviously a very different theory that's in front of the court. I would agree with you, Judge Ho. One can contemplate under Section 1 of the Sherman Act a situation where you might be able to show that there is an impact on competition from a concerted refusal to deal. Here in this case, what's before the court is an alleged monopolization and alleged maintenance of monopoly power claim. It's a completely different construct under the law. Okay. If I could say one thing about the state action claim... Since we've extended you, it's only fair. Okay. I would just say what the plaintiff seems to concentrate on now is saying that the boards are somehow public entities, right? For the First Amendment. For the First Amendment claim. And what I would say is that the Supreme Court has been very clear as recently as the case of Halleck in saying, in fact, that there are very, very few circumstances where a private organization qualifies as a public entity for state action purposes. And, in fact, even in that case, the Supreme Court took pains to explain that even a state monopoly, a state-granted monopoly to a private organization would not make that private organization a state actor sufficient to be able to bring a First Amendment claim. So, you know, going from the Supreme Court cases, of course, down to the Fifth Circuit cases, you see that very clear line of there are very, very few cases where a private organization has been found to usurp some function that was not formally performed by the states. There's clearly no function here that's been alleged that comes anything close to meeting that state action task. The district court didn't address any of this, right? That is... The court focused on standing and ended it there, so... Yeah, I mean... Whatever we do, we don't need to... There's a principle of we don't review issues that the district court hasn't passed upon first, so I presume this discussion would be subject to that principle. It would, although I would say that obviously also the court has the ability to uphold the district court on any ground. This is a matter of law decided on the sufficiency of the allegations in the complaint. It was fully briefed below. The court obviously  an Article III question and the antitrust standing question, you know, first, because, you know, it's appropriate for the court to have done that, but this is really a question of law that can be decided on the sufficiency of the allegations in the complaint. So, if you have nothing further, Your Honor, thank you. Thank you. Mr. Schlafly, you've reserved five minutes. Thank you, Your Honor. Now, picking up on the state action issue, the procedure of this appeal is such that all the allegations in the complaint have to be accepted as true and all the reasonable inferences have to go in my favor. This is an appeal for motion to dismiss. So the complaint is the factual record, the complaint. And here in the complaint, paragraph 81, I say that many hospitals and insurance networks require certification by the board defendants and thus the revocation of board certification can have a devastating effect on the practice of medicine by a physician, in some cases being tantamount to revoking his license to practice medicine. So the posture of this appeal would be to accept that as true and that looks like state action to me. I think state action really requires fact-finding, candidly. I think a remand to do some fact-finding on that for the First Amendment issue would be more appropriate rather than making a factual finding as to whether state action when these board defendants take this board revocation that they do. It's very scary, though. They've figured out a way to censor people and this is censorship today. In 2024, this is what censorship looks like. And this court says it's not going to tolerate corporations censoring what people say. And we've got an example of it right here in this case. They've figured out a way to exert influence over what physicians say by threatening them with board revocation. Just to make sure we're on the same page, what's the case? Sounds like you're referring to a specific case. No, I'm not referring to a specific case. I was referring to the complaint, the allegation. No, you said that our court has talked about corporations and censorship. Oh, I am. That's right, yes. And that's a case that was two years ago. That was a big case. It was the Net Choice versus Paxton case. It may have been Judge Oldham who wrote that. That's my recollection. Pending at the Supreme Court. Pending at the Supreme Court. Yes, it is. On the antitrust issue, Judge Ho, you're really onto something there and I just want to pick up on that. I'm not an antitrust expert, but Judge Ginsburg wrote about antitrust quite a bit. He worked in the antitrust division. I believe his position is that antitrust law is about a lot more than consumer welfare and that antitrust law is to protect a whole array of interests, possibly even environmental interests, for example. And I would dispute the way that this has evolved in antitrust law with some cases, not all of them, but some cases make it about competition and lower prices. It's not only about that. And when we get powerful corporations, in this case the Board of Defendants, censoring speech, I think antitrust law has something to say about that. And this is a case of first impression on that. I cite an AT&T case when they broke up AT&T and there was a little dicta there where someone said we shouldn't allow AT&T to be in publishing of phone books because that's kind of the first amendment thing. We don't want Monopoly doing that. So you get a little dicta here and there that Lorraine Journal case, it's kind of helpful, but this is a case of first impression, Judge Ho. And if we allow monopolies to censor, we're going to see a lot more censorship by monopolists. There has to be, antitrust has something to say about this, in my opinion. And if you look at the Wagner case... You mentioned Judge Ginsburg. Is there something in particular? Is there a case? I don't have a citation. I just know he gave some presentations. I listened to a talk by him. He's on the D.C. Circuit. He has tremendous experience in the antitrust area. I could forward something after argument, maybe try to pull something up on it if it would be helpful to you. But quite clearly he said no, it's not just about consumer welfare. And if you look, no case has really said it's just about consumer welfare. That's kind of a misperception of antitrust law. This Wagner case that the district court relied on where the district court said that antitrust injury is either competitors, purchasers, or consumers. And then the district court ran with that. Well, the very next sentence in that Wagner decision by this court, which was unpublished, says, but standing is not necessarily limited to this group. So if someone's being censored by a monopolist, seems to me he has standing to object to that. And I don't think we want to allow all the clever censors out there to start to misuse monopoly power to engage in censorship. Now, on the government's point, let me just say briefly, the approach to disinformation... Before you switch, and we extended the time, so don't worry about time right now. On this issue about the amendment and the rule and sort of the notion that you didn't plead how it would not be futile, do you want to at least have a chance to address that? Yeah, I would. It's not required that I plead individuals in my complaint. So now that the argument... I think what opposing counsel said is if you want to amend, you need to explain to the district court why the amendment would not be futile rather than just simply say I'll fix anything you identify. In other words, the idea is you have to help the district court and you allegedly failed to do so. So I just wanted to give you a chance. And respectfully, I don't think I really failed to do so because I'm not required to identify individuals in the complaint. So I don't know how I would think of that and say to the district court judge if you'd like me to identify individuals in the complaint, I'd be happy to do so. I don't really want to put them in harm's way, and I'm not required. I don't think the idea is you have to identify individuals. The idea is what else could you fix? What are you planning to do if you get the amendment? Before we grant you the amendment, what are you going to do so that we don't waste our time? Yeah, it depends on what this court would say. But I guess at this point, just as a matter of precaution, I would identify individuals. So I would identify just as a precaution. I don't think I have to. I guess the question is, did you tell the district court what you planned to do in an amendment? I don't believe I did specifically say what I planned to do in the amendment. Respectfully, I think my complaint was added. My thought was it's because of this rule that you might have felt this sort of certainly interesting local rule 6. Perhaps that was what sort of chilled you from... Anyway. It didn't appear I was going to get a right to amend. So with the page limits or whatever, I just... It looked futile because of rule 6, is what you're saying. Yes. I do allege in the complaint decreased attendance at conferences, reduced contributions to it, chilling effect. I allege that a couple times. Chilling effect on speakers, speakers at conferences. And so I think that's adequate. I don't think this is a rule 9 particularity requirement here, particularly when I identify them, they're going to be in harm's way. You notice in the AVM's presentation, they didn't put any limits on their ability to revoke board certification. I thought we might hear that they said they only do it. No, no. They don't accept any limits on their ability to revoke board certification. It's pretty frightening, really. Finally, I want to address the government's position. Yeah. There was a bit of a discussion about how much market power they really have and this notion that many hospitals require this, but there are hospitals that do not. I take it there's nothing in the record at this time since we're at MTD, but... Well, Judge Hull, I believe my complaint says they have over 80% of the market for board certification. Okay. So there's some percentage short of 20% of hospitals that would accept doctors without these certifications. That's slightly different, how many hospitals require it. It's a very high percentage, too. But in terms of certifying physicians, they have more than 80% of that market. So how many hospitals require it, it's probably close to that. I don't know exactly. I don't know if I allege how many hospitals require it. I'm sorry, what do you mean by they have 80% of... Are you saying that there are doctors out there who are practicing and out in the world who aren't certified but they're able to make a living? There's some of that. There's also, there are very small other board-certifying groups. So there is a very small... Okay, there are alternative ways to certify. There's an alternative to ABM, but they're a very small part of the market and very few hospitals accept that. Now, when opposing counsel said you can go practice somewhere, sure, in Alaska or rural Texas where there's no... If you can't get anybody, you can do that. But if you can't practice where you want to practice... The point is, I take it your theory is you're not excluded from the entire market. You're excluded from a robust percentage of it and then we're having a fight over market definition. Exactly. If I could just briefly address the government's point about disinformation. The approach by this circuit and by the other case, the Murphy v. Missouri case, is how it's captioned now in the Supreme Court, is to try to tackle government disinformation and enjoin some of the improper actions by government. The approach here is a little different. I want them to comply with FACA, the Federal Advisory Committee Act, which requires balance on committees and transparency in what they do. And they have not complied with that. And there was nothing really in the government's response here where they said they have complied with it, because they haven't. They haven't produced the documents they went through when they disbanded the... supposedly disbanded the Disinformation Governance Board. They haven't provided the transparency. They didn't provide the balance on the committees. Now, they're seeking the complete balance on their Homeland Security Advisory Council, HSAC. There needs to be balance on it. And that's an approach to this disinformation problem of government policing disinformation that if they're going to do it, and if they get away with doing it, they still have to comply with a balance requirement. And that could be valuable. That is of help. They have a committee of 33 people in the HSAC. You can look at them on the Internet. And it's not a balance committee. There is nobody from religious institutions. I don't know if there's anybody from Texas. I'd be surprised if a single one of them is on the other side of the political spectrum. Thank you, Your Honor. Thank you. Well argued on all sides in this case. Appreciate the arguments. The case is submitted, and we are adjourned.